# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CATHERINE ROBERT,

        *Plaintiff,*

vs.

        Case No. 08-2150-EFM

BOARD OF COUNTY COMMISSIONERS
OF BROWN COUNTY, KANSAS,
WARREN L. PLOEGER, in his individual
and official capacities, STEVE ROBERTS, in
his individual and official capacities, GLEN
LEITCH, in his individual and official
capacities, and VENICE SLOAN, in her
individual and official capacities,

        *Defendants.*

## MEMORANDUM AND ORDER

This case arises out of Plaintiff Catherine Robert's termination from her position as an

Intensive Supervision Officer ("ISO") for the Twenty-Second Judicial District Community

Corrections Program in July 2006. Leading up to her termination, Ms. Robert was on FMLA leave.

Believing that her termination was unlawful, Robert filed suit, alleging the following causes of

action: (1) Americans with Disabilities ("ADA") wrongful termination claim; (2) ADA failure to

provide reasonable accommodations claim; (3) Family and Medical Leave Act ("FMLA") retaliation

claim; (4) Employee Retirement Income Security Act ("ERISA") discrimination claim; (5) state law

wrongful termination claim; (6) state law breach of employment contract claim; (7) section 1983

deprivation of due process claim; and (8) section 1983 equal protection claim.  Defendants have

filed a summary judgment motion (Doc. 81) seeking to have all of Plaintiff's claims dismissed.  For

the reasons stated below, the Court grants Defendants' motion.

## I. BACKGROUND/FACTS[1]

Plaintiff Robert began working as an Intensive Supervision Officer ("ISO") for the Twenty-

Second Judicial District Community Corrections Program ("the Program"), which is comprised of

Marshall, Nemaha, Brown, and Doniphan Counties, as a Brown County employee, on July 1, 2003.

The purpose of the Program is to provide highly structured community supervision to felony

offenders, to hold offenders accountable to their victims and to the community, and to improve

offenders' ability to live productively and lawfully.  Defendant Venice Sloan was the Director of

the Program, and acted as the supervisor of all of the Program's employees – Ms. Robert, one other

ISO, an ISO Aide, and a secretary.  Ms. Robert was responsible for supervising offenders in Brown

and Doniphan Counties, while the other ISO was responsible for offenders in Marshall and Nemaha

Counties.

Sometime in 2003, with the help of Ms. Robert and others, Ms. Sloan developed a job

description for the ISO position.  Among other things, this document listed eighteen essential

---

[1]In her response, Plaintiff asks the Court to disregard the statements made by Defendant Sloan, which are relevant to deciding Defendants' motion, that cannot be independently verified by other pieces of evidence.  The basis of Plaintiff's request is that some of the statements made by Sloan in her affidavit and during her deposition conflict with unsworn statements she made to Plaintiff Robert around the time of her termination.  The Tenth Circuit allows a trial court to disregard statements at the summary judgment stage in certain circumstances.  However, in order to be excluded, the statement in question must conflict with an earlier statement that was made under oath.  *See Steele v. Kroenke Sports Enters., L.L.C.*, 264 Fed. Appx. 735, 744 (10th Cir. 2008).  Contrary to Plaintiff's suggestion, the Court does not read the holding in *Baum v. Gillman*, 648 F.2d 1292 (10th Cir. 1981), as providing it with the additional authority to dismiss all of a party's statements simply because that party appears to have lied to another party while not under oath.  Therefore, because Plaintiff has not shown that any of the Sloan statements relevant to deciding Defendants' motion conflicts with earlier statements made by Sloan while under oath, the Court will not disregard them when deciding Defendants' motion.

functions of an ISO.  The function of performing on-site visits to the offenders' homes, work places, and other places was not included in the list of eighteen essential function, even though Ms. Sloan claims that it is essential.  However, the document did state that considerable fieldwork would be required throughout the Twenty-Second Judicial District.  Further, it is uncontroverted that ISOs spend approximately twenty-five percent of their time outside of the office performing site visits at offenders' homes, workplaces, treatment providers, and other locations.

In January 2004, Ms. Robert developed sacroiliac joint dysfunction, a condition that causes lower back pain and led to Ms. Robert being unable to walk from January to April 2004.  Despite this limitation, Ms. Robert continued to work, but she was unable to perform certain functions, such as visiting offenders' homes or workplaces.  In an attempt to improve her condition, Ms. Robert had surgeries in April and June 2004.  From April 11, 2004, until May 11, 2004, and from May 23, 2004, until July 5, 2004, Ms. Robert was out from the office.  During this time Robert was not able to perform site visits, however, she did spend a great deal of time on the phone speaking with other agencies, officers, offenders, and court personnel regarding her caseload.  According to Ms. Sloan, Robert's absence caused a significant burden on the Program and its employees, as they had to take on a number of Robert's responsibilities.

On November 29, 2005, Robert fell in the Brown County Courthouse, which resulted in her again experiencing pain in her lower back and a decreased range of movement.  Because the fall occurred at work, it was covered by the County's workers' compensation insurance plan.  Ms. Robert was assigned a workers' compensation representative, Linda Naylor, who served as a liaison between Robert's doctor, Dr. Longley, and Sloan and the County Commissioners.  From January 2006 on, Ms. Robert was not able to, among other things, perform site visits to offenders' homes or

workplaces. In March, due to the restrictions on her mobility, Dr. Longley scheduled Plaintiff for an April 13, 2006, surgery. In anticipation of the surgery, on March 21, 2006, Robert submitted a Leave of Absence form, which Sloan signed, that stated that Robert would be absent from April 12, 2006, until an unknown date. Robert contends that she believed that this form entitled her to as much unpaid leave as she needed to return to work, despite the fact that the 2006 Brown County Personnel Policy Manual ("the Manual" or "the 2006 Manual") stated that requests for unpaid leave, "[a]fter approval by the department head, . . . should be submitted to the County Commissioners for approval,"[2] and it is uncontroverted that the Commissioners never approved granting Robert indefinite unpaid leave.

In addition to the Leave of Absence form, Sloan and Robert also signed a document called "Procedures during Cathy's Surgery and Recovery." Among other things, this document stated that Robert had twenty-two days of accumulated time off, that surgery and recovery time may extend eight to ten weeks, that Robert would not be permitted to work any hours until the County had received written authorization from the her doctor, and that after Robert had received a release to work from home she would be provided a computer to enable her to work from home.

Sometime before Robert left for surgery on April 12, she received a form entitled "Employer Response to Employee Request for Family or Medical Leave." This form stated that Robert's FMLA leave would begin on April 24, 2006, and continue until July 3, 2006, that the FMLA entitled Robert to twelve weeks of unpaid leave in a twelve-month period, and that Robert would be required to submit a fitness-for-duty certification prior to being restored to employment. While this form did not state employees who do not return to work at the end of their FMLA time would be terminated,

---

[2]Doc. 82-8.

it, like the other documents exchanged by the parties, did not contain a representation that Robert's job would be held open for her indefinitely until she could return to work.

Robert's surgery was performed on April 13. On April 24, Naylor advised Sloan of Robert's condition, stating that it would be a minimum of four to six weeks before Robert would be able to return to work. On May 12, a workers' compensation representative phoned Sloan and informed her that it was anticipated that Robert would be released to perform sedentary duties on July 17, but that would depend on the CAT scan.

On July 17, Robert had a follow-up examination, during which Dr. Longley issued a written release allowing Robert to work from home on a computer. Robert did not receive a copy of this release. Naylor claims not to have received a copy either, though, in his affidavit, Longley stated that it is his practice to provide a written copy of his releases to the patient's workers' compensation representative and that he had no recollection of not providing Ms. Naylor with Robert's release.

Following the July 17 exam, Naylor told Robert that she would contact her employer, see if they had any work for her to do on the computer, and, if they did, get her a release. Naylor failed, though, to ever inquire into whether such work existed. In fact, on July 19, when Sloan asked Naylor if Robert was able to use a computer, Naylor said no. Naylor did inform Sloan, however, that it was anticipated that Robert would be walking with a cane in three to four weeks and that at that time Naylor would ask that Robert be released to return to work. Robert's husband claims that sometime between July 17 and July 31, he told Sloan that his wife's doctor had released her to work from home. It is uncontroverted that Sloan and the County Commissioners never received a written release before July 31.

During her leave from April 12 to July 29, 2006, Robert was paid through Brown County's workers' compensation insurance. According to the Manual, Brown County continues to provide health care coverage to its employees while they are on leave under the same provisions it provided the coverage to them prior to leave. The Manual provides that, as a fringe benefit, the County will pay all full-time employees' health insurance premiums and a portion of their families' premiums. Robert continued to receive workers' compensation payments through December 28, 2006.

On July 31, 2006, following Sloan's recommendation, the Brown County Board of County Commissioners, whose members are Warren Ploeger, Steve Roberts, and Glen Leitch, voted to terminate Robert's employment because she did not have medical clearance and she could not perform her job duties. On the same day, Sloan went to Robert's home to inform her of the Commissioners' decision and to deliver to her her termination letter, which stated that she was being terminated because her FMLA covered leaved had expired on July 3 and she still is unable to return to work and fulfill her position's responsibilities. During her conversation with Robert, Robert repeatedly acknowledged that she was an at-will employee and that she could be terminated at anytime, a view that is consistent with the one expressed in the Manual that she received, which stated that Brown County employees are employed at-will and that their employment may be terminated with or without cause at any time. When asked by Robert why the Commissioners terminated her, Sloan stated that it was Robert's inability to return to work at 100% and the fact that the Commissioners did not want to set a precedent of allowing its employees to take unpaid leave in excess of twelve weeks. Sloan stated that Robert's FMLA leave had expired on July 24.

Around the same time that Robert was on leave, another County employee, Linda Scheuerman, a jailer in the County's Sheriff's office, was also on leave for a back injury.

Apparently, Ms. Scheuerman was on leave from December 29, 2005, until August 2, 2006. Before Ms. Scheuerman resumed working on August 2, she presented a doctor's release. On September 28, 2006, Ms. Scheuerman re-aggravated her back injury and took leave until February 12, 2007, the day the County terminated her employment.

According to Dr. Longley's work status report of September 18, 2006, Robert remained temporarily totally disabled until, at the earliest, November 27, 2006. At the time he issued the report, though, Longley stated that he believed it would be reasonable for Robert to attempt sedentary employment on a part-time basis.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[3] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[4] A fact is "material" when "it is essential to the proper disposition of the claim."[5] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[6]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[7] In attempting to meet this standard, the moving party need not disprove the

---

[3] Fed. R. Civ. P. 56(c).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[5] *Id.*

[6] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[8]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[9] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[12] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[13]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]

### Analysis

Plaintiff Robert asserts the following causes of action: (1) ADA wrongful termination claim; (2) ADA failure to provide reasonable accommodations claim; (3) FMLA retaliation claim; (4)

---

[8]*Id.* (citing *Celotex*, 477 U.S. at 325.)

[9]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[11]*Adler*, 144 F.3d at 671.

[12]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[13]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

ERISA discrimination claim; (5) state law wrongful termination claim; (6) state law breach of employment contract claim; (7) section 1983 deprivation of due process claim; and (8) section 1983 equal protection claim. The Court will review these claims in turn.

## ADA CLAIMS[15]

The ADA prohibits employers from discriminating against individuals on the basis of disability.[16] Under the ADA, unlawful discrimination occurs not only when an employer treats an employee differently because of her disability,[17] but also when the employer fails to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee.[18] Here, Plaintiff has asserted both a both discriminatory discharge claim and a failure to provide reasonable accommodations claim.[19]

### ADA Wrongful Termination Claim

To survive a motion for summary judgment on her ADA wrongful termination claim, Plaintiff must first establish a prima facie case, which means that she must produce evidence showing: (1) she is disabled within the meaning of the ADA; (2) she was qualified, with or without reasonable accommodation (which she must describe), to perform the essential functions of the job

---

[15]Significant changes to the ADA took effect on January 1, 2009. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. This Court has previously held that these changes do not apply to conduct that occurred before the changes took effect. *See LaBrue v. Gab Robins N. Am.*, 2009 WL 2355785, at *4 (D. Kan. July 29, 2009) (collecting cases). Plaintiff has not provided the Court with any reason to deviate from its earlier holding. Therefore, the Court will not apply the changes in this case.

[16]42 U.S.C. § 12112(a).

[17]*See id.*

[18]*See id.* § 12112(b)(5)(A).

[19]The Court harbors doubts that Plaintiff can assert both an ADA wrongful termination claim and ADA reasonable accommodation claim because, based on this case's facts, the latter seems duplicative of the former. However, because, as shown below, both of Plaintiff's ADA claims fail, the Court does not resolve this issue.

held or desired;[20] and (3) that her employer terminated her because of her disability.[21]  Second, after Defendant has articulated a valid, non-discriminatory reason for terminating her, Plaintiff must produce evidence indicating that Defendants' stated reason for their action is pretextual.[22]  Because the Court finds that Plaintiff has failed to show that a material factual issue exists as to whether she was able to perform the essential functions of her job, the Court grants Defendants' motion with regard to this claim without addressing the question of whether the other requirements are met.

In order to determine whether Plaintiff was qualified for a particular position, the Court is to engage in a two-part analysis: first, it must determine whether Plaintiff could perform the essential functions of her position, and second, if the answer to the first inquiry is no, whether any reasonable accommodations by Defendant would have enabled Plaintiff to perform those functions.[23]  The initial focus of the first-part of the analysis is "on whether [the] employer actually requires all employees in the particular position to satisfy the alleged job-related requirement."[24]  If the requirement is uniformly applied, "the inquiry will then center around whether removing the function would fundamentally alter the position."[25]

---

[20]The relevant time for determining whether an employee was qualified for a position is at the time she was terminated.  *See, e.g., Cisneros v. Wilson*, 226 F.3d 1113, 1129 n.12 (10th Cir. 2000), *overruled on other grounds in Bd. of Trustee of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).

[21]*See, e.g., Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 748 (10th Cir. 1999).

[22]*See, e.g., Butler*, 172 F.3d at 747-48 (applying the same burden-shifting test that was set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) to an ADA claim where the plaintiff did not have direct evidence of disability discrimination).

[23]*See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003).

[24]*Id.* at 1191.

[25]*Id.*

Here, Defendants contend that Plaintiff was not qualified because, among other things, she could not perform site visits. In support of their contention that this task is essential, Defendants offer the affidavit of Defendant Sloan, which states that site visits are essential and that ISOs spend fifty-percent of their time outside of the office performing such visits. In response, Plaintiff states that these visits are not essential because they are not explicitly listed as an essential function in the ISO handbook and ISOs spend only twenty-five-percent of their time outside of the office. The Court finds that Plaintiff has failed to raise a factual question as to whether site visits are an essential function. First, Plaintiff has offered no evidence that the requirement of performing site visits is not uniformly applied to the ISOs in the program. Second, while Ms. Sloan's statement that site visits are essential is not conclusive, it is nevertheless entitled to much weight due to the fact that she is the director of the Program.[26] Third, the fact that site visits are not explicitly stated in the handbook is of little consequence here, as the paragraph under the working conditions section of the handbook states that the position requires a considerable amount of fieldwork within the Twenty-Second Judicial District. Fourth, it is uncontroverted that ISOs spend twenty-five percent of their time performing site visits.[27] Therefore, in light of these facts, the Court concludes that no reasonable jury could find that performing site visits was not an essential function of Plaintiff's job as an ISO.

The fact that Defendants allowed Plaintiff to not perform site visits in 2004 does not alter the Court's conclusion. While the Tenth Circuit has not expressly addressed the question of whether special employment agreements that temporarily exempt employees with physical and mental

---

[26]*Id.*

[27]*See, e.g., Thompson v. E.I. Dupont deNemours & Co.*, 140 F. Supp. 2d 764, 783 (E.D. Mich. 2001) (stating that job functions that accounted for only ten to twenty percent of the employee's time were essential).

impairments from having to engage in a particular function are relevant to determining whether that function is essential, other courts have, finding that they are not.[28]  The reasoning behind treating such agreements in this manner is compelling, as to do otherwise would have the perverse effect of punishing those employers that go above and beyond the ADA's requirements and discouraging others from doing the same.  As a consequence, the Court finds that Plaintiff's treatment in 2004 is not relevant to the question of whether site visits are an essential function.

Because Plaintiff has failed to create a factual question as to whether site visits were an essential function of her job, and it is uncontroverted that Plaintiff could not perform such visits at the time of her termination, as she had not received the requisite release, the Court moves on to the second part of the analysis: determining whether any reasonable accommodations by Defendants would have enabled Plaintiff to perform this function.  In their briefing, Defendants argue that the accommodation Plaintiff sought was an exemption from site visits for an indefinite period of time. Plaintiff counters by stating that she was only seeking an exemption from performing site visits until the middle of August 2006 when it was possible that she would receive a release to return to work. Undoubtedly, there are circumstances in which the duty of reasonable accommodation may require an employer to grant an employee's request for an exemption from performing essential functions of her job.[29]  However, this duty does not obligate an employer to exempt an employee from

---

[28]*See, e.g., Basith v. Cook Cnty.*, 241 F.3d 919, 930 (7th Cir. 2001).

[29]*Cf. Rascon v. U.S. W. Commc'ns, Inc.*, 143 F.3d 1324, 1332-35 (10th Cir. 1998) (finding that the district court did not err in concluding that granting the plaintiff five months of leave was not an unreasonable accommodation where the plaintiff had presented evidence of the expected duration of his impairment, a course of treatment, and a good prognosis).

performing such functions indefinitely or for an excessive amount of time.[30] In determining whether the duration of the exemption is reasonable, the court must look at the totality of the circumstances.[31]

Here, at the time of her termination, Plaintiff had been exempt from performing site visits for at least six months, an amount of time that this Court has already found to be excessive.[32] Furthermore, at that point in time, it was far from clear how long it would be before Plaintiff would be able to perform site visits. While the evidence, viewed in the light most favorable to Plaintiff, indicates that Defendants were aware that Plaintiff was going to be able to walk with a cane sometime in the beginning to middle part of August and would be requesting a release to return to work then, it does not show that Defendants were aware that such a release would likely be granted, which is detrimental to Plaintiff's claim. The Tenth Circuit has repeatedly stated in the request for leave context that an employee's failure to inform her employer of the expected duration of her impairment will result in a finding that her request was not reasonable.[33] The Court sees no reason to deviate from this rule in the exemption context. Therefore, because there has been no showing that Plaintiff, or anyone acting on her behalf, ever informed Defendants after Plaintiff's surgery of how long it would likely be before Plaintiff received a release to return to work and resume performing site visits,[34] and in light of the fact that Plaintiff had been exempt from performing such

---

[30]*Cf. Lara v. State Farm Fire & Cas. Co.*, 2003 WL 22149667, at *11 (D. Kan. July 24, 2003) (stating that "courts have uniformly held that employers are not obligated to retain a disabled employee on unpaid leave indefinitely or for an excessive amount of time"), *aff'd*, 121 Fed. Appx. 796 (10th Cir. 2005).

[31]*Cf. Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1064-65 (10th Cir. 2001).

[32]*See Lara*, 2003 WL 22149667, at *11.

[33]*See, e.g., Cisneros*, 226 F.3d at 1128-31.

[34]As the record reveals, at the earliest, it would have been November 27, 2006, before Plaintiff could have performed site visits.

visits for over six months at the time of her termination, the Court finds that Plaintiff has failed to raise a genuine issue as to whether the accommodation she was seeking was reasonable.[35]  As a result, the Court grants Defendants' as it relates to Plaintiff's ADA wrongful termination claim.

## ADA Failure to Accommodate Claim

To present a prima facie failure to accommodate claim, Plaintiff must show that at the time of her termination: (1) she was disabled within the meaning of the ADA; (2) her employer knew of the disability; (3) she could perform, either with or without reasonable accommodation, the essential functions of the desired job; and (4) her employer refused to grant the requested accommodation.[36] As established above, Plaintiff has failed to raise a genuine issue of material fact as to element three. Accordingly, summary judgment should be granted to Defendants on this claim.

## FMLA RETALIATION CLAIM

Under the FMLA, employees are entitled to up to twelve weeks of unpaid leave in any twelve-month period if they are employed by an employer who meets the statutory criteria listed in 29 U.S.C. § 2611(4) and they have been employed by that employer for at least twelve months preceding their request for leave.[37]  Here, Plaintiff claims that Defendants terminated her employment in retaliation of her exercise of her FMLA rights, namely the right to have twelve weeks of unpaid leave.[38]  For FMLA retaliation claims where the plaintiff does not allege that she

---

[35]*See Cisneros*, 226 F.3d at 1131 (stating that it was unnecessary to determine whether the sought-after accommodation would have caused an undue burden because the plaintiff had failed to show that the accommodation was reasonable).

[36]*See Spielman v. Blue Cross & Blue Shield of Kan., Inc.*, 33 Fed. Appx. 439, 443 (10th Cir. 2002).

[37]*See* 29 U.S.C. § 2614(a)(4).  Neither party contends that either of these prerequisites are not met.

[38]In addition to a retaliation claim, the FMLA also creates an interference claim that prevents an employer from denying or otherwise interfering with the plaintiff's substantive rights under the Act.  *See DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159 (10th Cir. 2009).  Plaintiff has not asserted an interference claim in this case.  Even

has direct evidence of retaliation, which is the case here, the Court follows the same process set forth in *McDonnell Douglas v. Green*[39]: first, the plaintiff sets forth a prima facie case of retaliation, second, the defendant proffers a legitimate, nondiscriminatory reason for its actions, and third, the plaintiff presents evidence that the proffered reason is pretextual.[40]

To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate: "(1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two action."[41]  For purposes of this Order, the Court assumes without deciding that Plaintiff has established a prima facie case. Defendants offer the following reason for terminating Plaintiff: she failed to return to work with the requisite certification before her FMLA covered leave expired.  The FMLA regulation at 29 C.F.R. § 825.313(d), which was formerly codified at 29 C.F.R. § 825.311(c), provides that

> [w]hen requested by the employer pursuant to a uniformly applied policy for similarly-situated employees, the employee must provide medical certification, at the time the employee seeks reinstatement at the end of FMLA leave taken for the employee's serious health condition, that the employee is fit for duty and able to return to work if the employer has provided the required notice; the employer may delay restoration until the certification is provided.  Unless the employee provides either a fitness-for-duty certification or a new medical certification for a serious health condition at the time FMLA leave is concluded, the employee may be terminated.[42]

---

if she had, it would fail because she was provided with the twelve weeks of leave for which the Act provides.  *Barnes v. Ethan Allen, Inc.*, 356 F. Supp. 2d 1306, 1311 (S.D. Fla. 2005).

[39]411 U.S. 792 (1973).

[40]*See, e.g., Satterlee v. Allen Press, Inc.*, 443 F. Supp. 2d 1236, 1245 (D. Kan. 2006).

[41]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (10th Cir. 1997).

[42]29 C.F.R. § 825.313(d) (internal citations omitted).

Case law has consistently interpreted this regulation as giving an employer the ability to terminate an employee who has notice of its uniformly applied release-to-work requirement and fails to provide such release before her FMLA leave expires.[43]

In her briefing, Plaintiff seems to suggest that in addition to the requirements set forth in section 825.313(d) and the applicable case law, Defendants must also show that they informed Plaintiff that she would be terminated by a certain date if she did not provide the requisite certification and that Plaintiff, or someone acting on her behalf, never verbally informed them that Plaintiff's doctor had released her in order to rely on the protections emanating from section 825.313(d). Plaintiff has not cited to, and this Court has not found, any legal authority that supports Plaintiff's position. Therefore, in light of this apparent dearth and the plain language of the governing regulation, the Court concludes that as long as Defendants had a uniformly applied release-to-work policy, they notified Plaintiff of this policy, and Plaintiff failed to provide such release before her FMLA covered leave expired, Defendants' asserted reason for terminating Plaintiff was legitimate.

Here, the Manual states that employees returning from FMLA leave must provide a written release. Nothing in the record suggests that Defendants have not uniformly applied this requirement.[44] Furthermore, it is uncontroverted that Plaintiff signed a document stating that she would "not be permitted to work any hours until the county ha[d] received written authorization

---

[43]*See, e.g., Howard v. Inova Health Care Servs.*, 302 Fed. Appx. 166, 176-77 (4th Cir. 2008); *Burkett v. Beaulieu of Am., Inc.*, 168 Fed. Appx. 895, 896 (11th Cir. 2006); *Buettner v. N. Okla. County Medical Health Ctr.*, 158 Fed. Appx. 81, 85 (10th Cir. 2005); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1206 (D. Kan. 2006).

[44]The only other person in the record who took leave in excess of twelve weeks, Ms. Scheuerman, produced a doctor's release before returning to work.

from the doctor."[45]  Lastly, Plaintiff has failed to create a genuine issue of material fact as to whether Defendants actually received a certification before July 31,[46] a day that Plaintiff does not dispute is beyond when her FMLA covered leave expired.  Therefore, the Court finds that Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff.

Because Defendants have met their burden, Plaintiff must now come forth with evidence showing that Defendants' explanation was a pretext to conceal a retaliatory motive.[47]  In other words, Plaintiff must produce evidence that "(1) creates a fact issue as to whether the employer's proffered reasons are pretextual *and* (2) creates a reasonable inference that [unlawful retaliation] was a determinative factor in the adverse employment decision."[48]  Typically, "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, [will] permit the trier of fact to conclude that the employer unlawfully [retaliated]."[49]  However, there are instances where, "although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that

---

[45]Doc. 82-16.

[46]Plaintiff apparently believes that Dr. Longley's affidavit, which states that he issued a written release for Ms. Robert to begin working from home on July 17, 2006, and that it is his normal practice to provide such releases to the patient's case agent, raises a triable issue as to whether Defendants received the requisite release.  It does not.  Glaringly absent from Longley's affidavit is any allegation that he gave Defendants the release.  This omission is fatal because there is no evidence in the record showing that Plaintiff, her husband, Ms. Naylor, or anyone else provided a copy of the release to Defendants.

[47]*See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166 (10th Cir. 2007).

[48]*Mayer v. Nextel W. Corp.*, 318 F.3d 803, 807 (8th Cir. 2003) (emphasis in original); *see also Swackhammer*, 493 F.3d at 1168 ("[T]he falsity of an employer's proffered explanation, or the existence of differential treatment, defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only [nonretaliatory] motives, such an inference is logically precluded and summary judgment for the employer is appropriate.").

[49]*Robinson v. Cavalry Portfolio Servs., LLC.*, 365 Fed. Appx. 104, 111 (10th Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000)).

the action was [unlawful retaliation]."[50]  This case could be construed as presenting one of those instances.[51]

Plaintiff's first ground for arguing that Defendants' proffered reason is pretextual is that it is inconsistent with the reasons originally stated by Defendants for her termination.  The Court disagrees.  As recognized by the Tenth Circuit, in cases where multiple individuals participate in a termination decision, it is likely that there will be a variety of reasons given for the termination, as "each individual may consider a different reason to be the essential factor in a decision to terminate."[52]  Absent the stated reasons being inconsistent or conflicting, though, the credibility of these reasons will not be undermined.[53]  Here, the reasons stated by Defendants for Plaintiff's termination are neither inconsistent with nor contradictory of the reason now proffered by Defendants.  As a consequence, they are insufficient to raise a factual question as to pretext.

Plaintiff next argues that pretext is shown by the fact that Defendant Sloan told her that the County fired her because they did not want other workers to expect to be able to take unpaid leave in excess of FMLA leave, yet the County allowed Ms. Scheuerman to take unpaid leave after her FMLA leave expired.  Arguably, this evidence raises a question as to the veracity of the reason stated by Sloan.  However, for the reason stated below, this evidence of pretext, coupled with Plaintiff's other prima facie evidence of retaliation, namely the fact that she was not terminated in

---

[50]*DeFreitas*, 577 F.3d at 1163 (quoting *Reeves*, 530 U.S. at 148).

[51]Plaintiff's evidence only arguably contradicts one of Defendants' reasons for terminating her: not wanting to set a precedent of allowing employees to take leave in excess of twelve weeks.  However, as shown below, even assuming that such a contradiction does exist, Plaintiff's claim does not survive summary judgment.

[52]*See Hare v. Denver Merchandise Mart, Inc.*, 255 Fed. Appx. 298, 305 (10th Cir. 2007).

[53]*Id.*

2004 when she took nearly ten weeks of leave and Defendants have not consistently stated when her leave ended, is insufficient to overcome Defendants' motion for summary judgment.

The fundamental problem with Plaintiff's claim is that the law governing FMLA retaliation claims, unlike the law governing other retaliation claims, specifically allows an employer to terminate an employee for engaging in protected activity, i.e., taking twelve weeks of leave, so long as certain requirements are satisfied – employer has in place a uniformly applied release to work policy, employee had notice of such policy, and employee failed to provide the required release before her FMLA leave expired. Here, there is there is not factual issue as to whether these requirements are met.[54] Therefore, as a matter of law, Plaintiff's FMLA claim fails, and Defendants are entitled to summary judgment on it.

**ERISA RETALIATION CLAIM**

Plaintiff contends that Defendants retaliated against her for exercising benefits that she was entitled to under the provisions of her employee benefit plan. ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, or discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan."[55] When a plaintiff lacks direct evidence of retaliation, which is the case here, she can still make out an ERISA-based retaliation claim through the *McDonnell Douglas* three part burden shifting framework, which, as noted above, entails Plaintiff establishing a prima facie case of retaliation, Defendants articulating a legitimate, nonretaliatory reason for their action, and Plaintiff

---

[54]The fact that Plaintiff failed to provide the requisite release makes the fact that her doctor had released her to perform some duties irrelevant.

[55]29 U.S.C. § 1140.

attempting to show pretext.[56]  To establish a prima facie case, Plaintiff must show: (1) that she participated in a statutorily protected activity, e.g., exercised rights she was entitled to under a healthcare plan covered by ERISA, (2) that an adverse employment action was taken against her, and (3) a causal connection existed between her participation in a statutorily protected activity and the adverse employment taken against her.

In their motion, Defendants argue that Plaintiff cannot meet the first element of a prima facie case because she was a participant in a governmental plan, i.e., a plan established or maintained by a political subdivision,[57] which 29 U.S.C. § 1003(b)(1) explicitly exempts from ERISA coverage. In response, Plaintiff does not challenge Defendants' assertion that section 1003(b)(1) exempts such plans nor does she offer evidence that the plan in question does not qualify for § 1003(b)(1)'s exemption, rather, she merely argues that Defendants' motion should be denied because they failed to put forward any evidence that the plan she participated in was established or maintained by a political subdivision.  The Court disagrees.  First, the Court takes judicial notice of the fact that Brown County is a political subdivision, as the Kansas Supreme Court has so declared.[58]  Second, Defendants have produced evidence that the County established or maintained Plaintiff's plan.  The Manual states that, as a fringe benefit to its employees, the County will pay at least a substantial amount of the employee's insurance premium.  Courts have found that an employer's payment of

---

[56]*See, e.g, Manning v. Am. Rep. Ins. Co.*, 604 F.3d 1030, 1042 (8th Cir. 2010).

[57]*See* 29 U.S.C. 1002(32).

[58]*See, e.g., Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 996 (8th Cir. 2007) ("[W]e may take judicial notice of proceedings in other courts that relate to matters at issue).  In *Weber v. Bd. of Cnty. Comm'rs of Marshall Cnty.*, 289 Kan. 1166, 1176, 221 P.3d 1094, 1101 (2009), the Kansas Supreme Court stated that counties are political subdivisions.

insurance premiums qualifies the employee's healthcare plan for the governmental plan exemption.[59]

Therefore, in light of this precedent, and the record's evidence, the Court finds that Defendants have met their initial burden of showing that they are entitled to summary judgment.[60]  Because Plaintiff did not produce any evidence in response to Defendants' showing, and thus has failed to create a factual question as to this issue, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's ERISA claim.[61]

**WORKERS' COMPENSATION RETALIATION CLAIM**

Workers' compensation retaliation claim are subject to the *McDonnell Douglas* burden-shifting test outlined above when the plaintiff does not have direct evidence of retaliation, which is the case here.  To establish a prima case, Plaintiff must show: (1) she filed a claim for workers' compensation benefits; (2) Brown County knew of Robert's workers' compensation claim; (3) Brown County terminated Robert from her employment; and (4) there is a causal connection between Robert's filing for workers' compensation benefits and her termination.[62]  Among other reasons, Defendants claim that they are entitled to summary judgment because Robert cannot show a causal connection between her filing for workers' compensation benefits and her termination.

---

[59]*See, e.g, Fromm v. Principal Health Care of Iowa, Inc.*, 244 F.3d 652, 653-54 (8th Cir. 2001) (citing *Silvera v. Mutual Life Ins. Co.*, 884 F.2d 423, 426 (9th Cir. 1989)).

[60]*See Trainor v. Apollo Metal Specialities, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) ("Under Rule 56(c), the moving party bears the initial burden of presenting evidence to show the absence of a genuine of material fact.").

[61]Because the Court finds that Defendants are entitled to summary judgment on the ground that the plan in question is exempt from ERISA, it does not address Defendants' alternative argument that Plaintiff cannot show a causal connection between her exercise of rights under the plan and her termination.

[62]*See, e.g., Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility*, 278 Kan. 427, 437, 101 P.3d 1170, 1177 (2004).

In retaliation cases, the temporal proximity between when a claim is filed and when the adverse employment action is taken is the "typical beginning point for proof of a causal connection."[63] When the proximity between the two events is not very close, the plaintiff must produce additional evidence to show a causal connection.[64] Here, approximately eight months separated Plaintiff's filing for workers' compensation and her termination. Therefore, Plaintiff must point to some other evidence in the record to show causation. In an attempt to create a factual issue, Plaintiff directs the Court's attention to the following: (1) the differences in the treatment she received in 2004 and 2006; (2) the inconsistencies between the reasons given by Defendants for her termination; (3) the fact that Defendants acted contrary to their written policy of allowing employees leave without pay by terminating Ms. Robert simply because her FMLA leave had ran out; and (4) the fact that Ms. Scheuerman, an employee of the County's Sheriff's office, was able to take unpaid leave in excess of the time provided for by FMLA.

Plaintiff has failed to create a genuine issue of material fact as to whether her termination was motivated by her filing of a workers' compensation claim. First, the treatment she received in 2004 when she did not file a claim cannot serve as a point of comparison because the facts surrounding that treatment are not sufficiently similar to the facts surrounding the 2006 treatment. For example, most notably, the duration of Plaintiff's absence in 2006 was substantially longer than her absence was in 2004. Second, while the reasons given by Defendants for Plaintiff's termination are not exactly the same, as explained above, they are not incompatible or inconsistent. Thus, they

---

[63]*Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 555, 35 P.3d 892, 899 (2001).

[64]*See, e.g., Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

are insufficient to show retaliation was the motivating cause of Plaintiff's termination.[65] Third, Plaintiff has not pointed to any written policy stating that the County automatically grants unpaid leave upon the expiration of an employee's FMLA leave. Fourth, because Ms. Scheuerman was in a different department and held a different position, the fact that she was able to take unpaid leave in addition to her FMLA leave is not probative on the question of whether Plaintiff was retaliated against.[66] Even if Ms. Scheuerman was in the same department and held the same position, though, her treatment would not give rise to an inference of retaliation because there has been no showing that she did not receive any workers' compensation payments.[67] Without such a showing, there is no reasonable basis to infer that the difference between the treatments was attributable to the fact that Defendants sought to punish Robert for filing a workers' compensation claim. Therefore, for the reasons stated herein, the Court concludes that no reasonable jury could find that there was a causal connection between Plaintiff's filing of a workers' compensation claim and her termination. Accordingly, Defendants' motion, as it relates to this claim, is granted.

**BREACH OF EMPLOYMENT CONTRACT CLAIM**

Kansas subscribes to the employment-at-will doctrine. Thus, absent an express or implied contract fixing the duration of the employment or limiting the employer's ability to terminate the employee, or a recognized public policy concern being applicable, employment is terminable at the will of either party.[68] Plaintiff contends that she was terminated in violation of both an express and

---

[65]*See Hare*, 255 Fed. Appx. at 305.

[66]*See, e.g., LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 694 (8th Cir. 2001).

[67]Ms. Scheuerman was injured while at work.

[68]*See Brantley v. Unified Sch. Dist. No. 500*, 2010 WL 5173817, at *6 (10th Cir. Dec. 16, 2010); *Gooch v. Meadowbrook Healthcare Servs. of Fla., Inc.*, 1996 WL 67193, at *5 (10th Cir. Feb. 16, 1996); *Auld v. Value Place Prop. Mgmt. LLC*, 2010 WL 610690, at *2 (D. Kan. Feb. 19, 2010) (citing *Frye v. IBP, Inc.*, 15 F. Supp. 2d 1032, 1046

-23-

implied employment contract. The Court disagrees. First, neither of the documents that Plaintiff

bases her employment contract claim on, the Leave of Absence Form and the "Procedures during

Cathy's Surgery and Recovery" form, contain a statement regarding duration of employment or

places limits on Defendants' ability to terminate her. Therefore, these documents do not provide

a basis for a breach of express employment contract claim stemming from her termination.[69]

Second, Plaintiff's evidence is insufficient to create a factual issue as to whether an implied contract

existed because it does not show that Defendants made an implicit promise not to terminate her.[70]

This Court has previously held that the fact that the plaintiff received an employee manual stating

that her employment is at-will and she understands what that means, which is the case here,

"severely undercut[s] the merits of plaintiff's claim."[71] In fact, it has gone so far as to state that

when the employer does not make statements that are inconsistent with having the ability to

---

(D. Kan. 1998)).

[69]*See, e.g., Gooch*, 1996 WL 67193, at *5. Based on Plaintiff's response, it appears that Plaintiff believes that these documents also give rise to a breach of contract claim because they provided her with the right to receive an unlimited period of unpaid leave and a laptop upon receiving a doctor's release to work and Defendants did not give her unlimited leave and a laptop. The Court disagrees. First, as stated in the 2006 Manual, which Plaintiff concedes she received, *see* Doc. 82-9, Plaintiff was entitled to unpaid leave only if the County Commissioners approved it. Plaintiff contends that such approval was unnecessary because the Manual says it is optional, as opposed to mandatory. The Court reads the Manual differently. While it is true that the Manual says that "[a]fter approval by the department head, [the unpaid leave request] *should* be submitted to the County Commissioners for approval," *see* Doc. 82-8 (emphasis added), the Court finds, based on the context in which this phrase is placed, that approval by the Commissioners was mandatory, not optional. *See, e.g., Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998) (finding, based on the context, that the word "should" meant "must"). Therefore, because Plaintiff did not receive the Commissioner's approval, she was not entitled to unpaid leave. Second, Plaintiff was entitled to receive a laptop only after the County received a written release from her doctor, which also did not occur. Therefore, to the extent Plaintiff is attempting to assert a breach of contract based on the two theories stated earlier in this footnote, her efforts fail.

[70]*See Abbott v. BNSF Ry. Co.*, 383 Fed. Appx. 703, 709 (10th Cir. 2010) (stating what the plaintiff's evidence must show in order to survive summary judgment).

[71]*Taylor v. Home Depot U.S.A., Inc.*, 506 F. Supp. 2d 504, 518 (D. Kan. 2007) (quoting *Henderson v. Montgomery Cnty., Kan., Bd. of Comm'rs*, 213 F. Supp. 2d 1262, 1278 (D. Kan. 2002)).

terminate an employee at will, such a provision is determinative.[72]  Here, Plaintiff relies on the two

documents mentioned above, Defendants' past treatment of her, and Defendant Sloan's statement

to her that she had as much time as she needed to recuperate to show that she had an implied

employment contract. None of this evidence is inconsistent with Defendants having the ability to

terminate Plaintiff at will.[73]  As a result, the Court finds that Defendants' motion for summary

judgment on Plaintiff's breach of employment contract claim should be granted

## PROCEDURAL DUE PROCESS CLAIM

The Fifth Amendment's procedural due process protections, applicable to the states through

the Fourteenth Amendment, only applies to individuals deprived of a recognized property or liberty

interest.[74]  To determine whether an individual has a protectable property interest, the Court must

look to state law.[75]  Kansas courts have concluded that at-will employees do not have a "vested

property interest in [their] job which is entitled to protection by the Fourteenth Amendment.  No

property interest in a job exists unless it is created by statute, ordinance, or implied or written

contracts."[76]  As noted above, Plaintiff has failed to raise a triable issue as to whether she had a

contractual right to employment with the County.  Because of this fact, Defendants' motion should

be granted as to this claim.

---

[72]*Id.* at 518.

[73]*See, e.g., id.* at 519 (stating that a manager's comment that he saw no reason why plaintiff could not stay in her position until she retired was not inconsistent with at-will employment).

[74]*See, e.g., Anglmyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 536 (10th Cir. 1994).

[75]*See, e.g., Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972).

[76]*Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1136 (10th Cir. 1994) (quoting *Pilcher v. Bd. of Cnty. Comm'rs*, 14 Kan. App. 2d 206, 210, 787 P.2d 1204, 1208 (1990)).

## EQUAL PROTECTION CLAIM

Plaintiff alleges that her equal protection rights were violated because she was intentionally discriminated against based on her status as a disabled person.[77] "The equal protection clause provides that '[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the law.' "[78] The level of scrutiny that the Court applies to a plaintiff's equal protection claim hinges upon whether the governmental action in question implicates a fundamental right or classifies individuals using a suspect classification."[79] Here, the action in question did not implicate a fundamental right nor did it involve classifying an individual based on a suspect classification.[80] Therefore, the Court will apply rational basis review to Plaintiff's claim.[81]

Under rational basis review, a plaintiff must show that the governmental action in question was not rationally related to a legitimate interest in order to establish an equal protection violation.[82] This standard is rigorous, demanding that the plaintiff negate "any reasonably conceivable state of facts that could provide a rational basis for the [governmental action]."[83] Here, Defendants undoubtedly had a legitimate interest in filling the ISO position with an individual capable of performing all of the position's responsibilities. Furthermore, terminating an employee who cannot

---

[77]Plaintiff provided no response to Defendants' argument that summary judgment should be granted on her equal protection claim.

[78]*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006) (quoting U.S. Const. amend. XIV, § 1).

[79]*Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008).

[80]*Welsh v. City of Tulsa, Okla.*, 977 F.2d 1415, 1419 (10th Cir. 1992) (stating that the "handicapped do not constitute a suspect class").

[81]*Price-Cornelison*, 524 F.3d at 1110.

[82]*Welsh*, 977 F.2d at 1420.

[83]*Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).

meet all of the position's responsibilities is rationally related to that interest.[84]  Therefore, the Court

finds that summary judgment should be granted on this claim as well.

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Doc.

81) is hereby GRANTED.

**IT IS SO ORDERED**.

Dated this 2nd day of March, 2011.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[84]*Cf. Welsh*, 977 F.2d at 1420 (finding that the city's decision not to hire the plaintiff as a firefighter because he required a special accommodation did not violate the plaintiff's equal protection rights).